# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>ALTON EASLEY,<br><br>      Defendant. | No. CR05-4107-MWB<br><br>**REPORT AND RECOMMENDATION** |

_____

This matter is before the court on the defendant's motion to suppress evidence, Docket No. 16. The plaintiff (the "Government") has resisted the motion. *See* Doc. No. 24. Pursuant to the trial management order, motions to suppress in this case were referred to the undersigned United States Magistrate Judge for review, and the issuance of a report and recommended disposition. Doc. No. 13. Accordingly, the court held a hearing on the motion on December 13, 2005, at which Assistant U.S. Attorney Shawn S. Wehde appeared on behalf of the Government, and the defendant Alton Easley appeared in person with his attorney, Todd W. Lancaster. The Government offered the testimony of Sioux City police officers Robert Hansen and Salvador Sanchez, and Nebraska State Patrol officers Jason Scott and Richard Lutter. Subsequent to the hearing, the parties filed supplemental briefs in support of their respective positions. *See* Doc. Nos. 28 & 29. The court finds the motion has been fully submitted and is ripe for consideration.

Preliminarily the court notes Easley's motion to suppress involves two unrelated searches. The court will address each of the two searches separately.

# I. SEARCH AT OMAHA BUS DEPOT

## A. Background Facts

On July 21, 2005, Officers Scott and Lutter were working with the Nebraska State Patrol's Commercial Interdiction Unit, which is tasked with disrupting the flow of narcotics coming into and traveling through Nebraska by commercial carrier. At about 6:30 a.m., the officers were conducting their daily activity of watching the morning buses coming into the Greyhound bus terminal in Omaha, Nebraska. The officers watched people exit the buses, examined luggage for packages consistent with drug couriers, and watched for suspicious activities.

The officers observed two black males, later identified as Alton Easley and Gregory Johnson, exit one of the buses. The men appeared to be traveling together. Easley and Johnson walked over and stood against the wall of the terminal, twenty-five to thirty feet from the bus, where they watched as the officers checked the baggage and the bus. The officers testified it was not unusual for passengers to notice the officers' activities, but usually, people would pay little attention to what the officers are doing. However, Easley and Johnson seemed unusually interested in what the officers were doing.

The officers approached Easley and Johnson. The officers identified themselves and showed their identification. Officer Scott advised Easley and Johnson that they were not under arrest or in any kind of trouble, and asked if the officers could speak with them. Easley and Johnson agreed to speak with the officers. Officer Scott spoke with Johnson, while Officer Lutter spoke with Easley.

Johnson identified himself to Officer Scott as Michael Aaron. Shortly thereafter, Officer Scott saw Easley point to Johnson and identify him as "Greg." Officer Scott asked Johnson if he had his bus ticket with him, or any sort of identification. Johnson did not produce a ticket or an I.D., and he began making furtive movements toward his waistline, as if he were trying to adjust something or gain access to something in that area. Officer Scott testified Johnson kept turning his waistline away from the officer, as if he were

trying to hide something. Johnson was dressed in baggy street clothing. Johnson stated his bus ticket was still on the bus, and he and Officer Scott went back onto the bus to try to locate the ticket. Johnson identified a black duffel bag as his, and stated his ticket was in the bag. However, after looking through the bag, he still was unable to produce his ticket. He and Officer Scott got back off of the bus.

While these events were taking place, Officer Lutter was talking with Easley. Easley said he had traveled to Kansas City to get his cousin, whom he identified as Johnson. Easley voluntarily provided his bus ticket to Officer Lutter, and the officer observed that Easley's hand was shaking. The officer noted the ticket was for an individual named Forest Smith, who had purchased a one-way ticket from Kansas City, Missouri, to Sioux City, Iowa, for cash, about two hours prior to travel. Officer Lutter testified that in his experience, drug couriers often purchase a one-way ticket for cash a short time prior to travel, and this increased his suspicion. Officer Lutter asked Easley for his identification. Easley stated his I.D. was on the bus, and he agreed to retrieve it. By this time, Officer Scott and Johnson had already gotten back off of the bus.

Easley and Officer Lutter got onto the bus, but Easley could not locate his luggage. Easley got off the bus and asked Johnson what had happened to "the bag," but Johnson did not respond. Easley got back onto the bus, and walked to a black duffel bag located a few seats directly behind the driver's seat. Officer Lutter testified Easley appeared to be extremely nervous and uncomfortable as he attempted to locate his I.D. Easley was speaking in partial sentences, and he would not make eye contact with the officer. Once he located the duffel bag, he unzipped the bag, handled it briefly, and then, according to Officer Lutter, Easley just stopped and stared at the officer. The officer asked Easley if that was his bag, and Easley did not respond or communicate at all; he just stood and stared. Easley never gave any indication as to whether or not he had found his I.D.

Outside, the bus, Officer Scott continued talking with Johnson. He told Johnson the officers were watching for people who might be transporting drugs, bombs, guns, money,

etc. When the officer got to the "gun" portion of his explanation, Johnson raised his shirt from his waistline and stated he did not have any guns. When Johnson raised his shirt, Officer Scott saw clear plastic baggies at Johnson's waistline. The officer pointed to the baggies, and Johnson turned and ran from the officer, down the length of the bus and out onto the street. As he pursued Johnson, Officer Scott yelled "Rich," which is Officer Lutter's first name. Johnson tripped and fell to the ground. While Officer Scott and another officer who was at the scene were attempting to take Johnson into custody, Johnson kept putting his hands into his waistband. Johnson threw a bunch of pills out into the street. The officers believed the pills to be Ecstacy.

On the bus, Officer Lutter heard Officer Scott yell his name. Officer Lutter looked out the window of the bus and observed Johnson running from the scene, tripping and falling, and being apprehended by officers. Officer Lutter immediately put his hands on Easley, advised him to remain still, and stated he would be put in handcuffs for the officer's personal safety. Officer Lutter testified he was concerned because of Easley's behavior and the other circumstances at the terminal. He stated Easley appeared nervous, would not make eye contact during conversation, and his hand was shaking when he presented the bus ticket to the officer. Easley did not answer questions in complete sentences, and he mumbled when speaking. Easley's nervousness appeared to increase as the encounter continued, until the point where he "shut down" and quit even trying to locate his identification. The officer's concern and suspicion were increased when Easley's traveling companion ran from officers. However, the officer testified Easley never offered any resistance or made any threatening motions toward the officer.

Officer Lutter handcuffed Easley, and the two of them got off the bus. Officer Lutter testified he planned to conduct a pat-down search of Easley, but he did not want to conduct the search in the confined area of the bus aisle. The officer began a pat-down search of Easley to check for weapons or dangerous items. While he was conducting the

search, Officer Lutter observed pills on the ground in the area where Johnson was being arrested, and he heard other officers state there were controlled substances present.

During the pat-down search of Easley, Officer Lutter felt plastic bags in Easley's pockets. The bag in Easley's left pocket felt as though it contained pills, and another bag felt like it contained a powdery substance. Officer Lutter removed the plastic bags from Easley's pockets and identified the bags' contents as probable Ecstasy pills and powder cocaine. Tests later confirmed one bag contained 65 1/2 tablets of Ecstasy, and the other bag contained 64 grams of powder cocaine. Officer Lutter testified that at the time the baggies were removed from Easley's pockets, Easley was not under arrest.

### *B. The Parties' Arguments*

Easley argues Officer Lutter lacked probable cause to detain and search him. He asserts the only information available to Officer Lutter was that Easley was traveling from Kansas City with Johnson, Johnson had tried to run from officers, and a controlled substance was found on Johnson's person. Easley argues these facts were insufficient to justify a pat-down search of his person, and the search violated his rights under the Fourth Amendment to the United States Constitution. *See* Doc. No. 16.

Easley further argues the facts were insufficient to raise a reasonable suspicion that he was committing, or was about to commit, a crime, for purposes of justifying his temporary seizure for investigatory purposes pursuant to *Terry v. Ohio*, 391 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). He points out that although the officer could consider the fact that Easley was Johnson's companion, and Johnson was fleeing from officers and appeared to have controlled substances in his possession, these facts alone could not justify a frisk, and his "mere propinquity" to Johnson was, without more, insufficient to justify detaining him or to constitute probable cause for a search of his person. Doc. No. 28, p. 3 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 342, 62 L. Ed. 2d 238 (1979); *United States v. Flett*, 806 F.2d 823, 827 (8th Cir. 1986)).

5

The Government argues the facts justified a *Terry*-type detention and pat-down search of Easley. The Government asserts "the additional evidence of drugs located on Johnson, provided a basis for the arrest of Easley and a lawful search incident to the arrest which yielded the seizure of drugs[.]" Doc. No. 29, p. 3. In its supplemental brief, the Government further argues the circumstances warranted a protective frisk of Easley for officer safety, noting "[t]he danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced." *Id.* (citing *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000); *United States v. Abokhai*, 829 F.2d 666, 670-71 (8th Cir. 1987)). The Government asserts the facts must be assessed in light of the officers' experience and expertise, and based on the totality of the circumstances, rather than on discrete events. Doc. No. 29, pp. 3-4 (citing *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987); *United States v. Wallroff*, 705 F.2d 980, 988 (8th Cir. 1983)).

To counter Easley's argument that his mere companionship with Johnson was insufficient to form a reasonable suspicion that Easley was engaged in criminal activity, the Government argues the actions of an individual's companion may be considered by officers in forming a reasonable suspicion that justifies seizing and frisking the individual. Doc. No. 29, p. 6 (citing *United States v. Dupree*, 202 F.3d 1046, 1049 (8th Cir. 2000); *United States v. Menard*, 898 F. Supp. 1317, 1323-27 (N.D. Iowa 1995); *United States v. Flett*, 806 F.2d 823, 827 (8th Cir. 1986); *United States v. Bailey*, 547 F.2d 68, 70 (8th Cir. 1976)).

*C. Discussion*

The analysis begins with the Fourth Amendment's guarantee of a person's right to be secure against unreasonable searches and seizures of his or her person, house, papers and effects. The United States Supreme Court has held repeatedly that "searches and seizures conducted outside the judicial process, without prior approval by judge or

magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135, 124 L. Ed. 2d 334 (1993) (internal quotation marks, citations omitted).

One such exception was recognized by the Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *Terry* considered the right of a police officer to stop and inquire of a person engaging in suspicious activity which leads the officer to believe a crime may be taking place. In that context, the Court further considered whether the officer making the inquiry can search the individual whose behavior is being investigated. The *Dickerson* Court explained the *Terry* holding as follows:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. . . ." Rather, a protective search – permitted without a warrant and on the basis of reasonable suspicion less than probable cause – must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.

*Dickerson*, 508 U.S. at 373, 113 S. Ct. at 2136 (citations omitted) (quoting *Terry, supra*, 392 U.S. at 24, 26, 88 S. Ct. at 1881, 1882; *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 1922-23, 32 L. Ed. 2d 612 (1972)). The officer's justification for conducting a *Terry*-type search must be reasonable, based on "specific and articulable facts . . ., together with rational inferences from those facts." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1868. The Court noted "[t]his demand for specificity in the information upon which

7

police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Id.* n.18.

The *Terry* court explained the duty of a reviewing court in considering the propriety of such a search:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple good faith on the part of the arresting officer is not enough. . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police.

*Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880 (internal quotation marks, footnote, citations omitted).

The courts' inquiry "in determining whether the seizure and search were 'unreasonable' . . . is a dual one – whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19, 88 S. Ct. at 1879. Further, "[d]ue to the unique nature of this type of search, each case is to be decided on its own facts." *United States v. Flett*, 806 F.2d 823, 826 (8th Cir. 1986) (citing *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884-85).

In determining whether Officer Lutter's detention and search of Easley were reasonable, the court is mindful of the Eighth Circuit's rejection of the "automatic companion" rule, by which some courts have held "all companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971). The Eighth Circuit "expressly rejected the 'automatic companion' rule, requiring instead that the search of a companion of an arrestee be reasonable in the 'totality of the circumstances,' *including* companionship with the arrestee[.]" *United States v. Menard*, 898 F. Supp. 1317 (N.D. Iowa 1995), *aff'd* 95 F.3d 9 (1996) (quoting *Flett*, 806 F.2d at 827). In making its inquiry into whether the search of Easley was an "automatic companion" or "mere propinquity" search, the "court must give due weight to the inferences that can be drawn from the officer's general experience." *Flett*, 806 F.2d at 827-28 (citing *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883; *United States v. Bell*, 762 F.2d 485, 500 (6th Cir. 1985)).

In the present case, there was more than mere propinquity to support the detention and pat-down search of Easley. At the inception of Easley's detention, Officer Lutter was aware of the following facts. He had observed Easley and Johnson taking an unusual interest in the officers' activities at the bus station. He had observed Easley's initial nervousness, as Easley's hands shook when he handed his bus ticket to the officer and Easley would not make eye contact. The officer had seen Easley's nervousness increase throughout the encounter until the point where Easley completely quit responding to questions and simply stood and stared at the officer. He had been presented with a bus ticket bearing a name different from Easley's, and showing the one-way ticket was purchased with cash a short time before departure. He was aware that Easley and Johnson had been unable to produce identification. While he was on the bus with Easley, the officer heard his partner yell out his name, and he saw Johnson running from, and then

9

being apprehended by, officers. The court finds it was reasonable for Officer Lutter to believe his safety could be in danger from Easley. *See Terry*, 392 U.S. at 27, 88 S. Ct. at 1883 (standard is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."); *accord Flett*, 806 F.2d at 828. In addition, the court finds Easley's detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19, 88 S. Ct. at 1879.

For the same reasons, the court finds Officer Lutter was justified in conducting a protective pat-down search of Easley. The officer was presented with a volatile situation in which Easley was acting suspiciously, he had not been able to produce appropriate identification, he had stopped responding to questions, and his companion was fleeing from the scene. An officer "need not actually fear that [an] individual is armed and dangerous," as long as an officer in the same circumstances "reasonably could believe that the individual is armed and dangerous." *United States v. Hanlon*, 401 F.3d 926, 929 (8th Cir. 2005). Further, "an individual's actions during a consensual encounter may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety." *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000). Here, Easley's actions during his consensual encounter with the officers, coupled with Johnson's activities outside the bus, raised a reasonable, articulable suspicion that Easley could present a threat to Office Lutter, justifying Easley's detention and the protective pat-down search. *See also United States v. Roggeman*, 279 F.3d 573 (8th Cir. 2002).

The next issue is whether Officer Lutter was justified in seizing the plastic baggies of drugs from Easley's pockets.

> While the purpose of a pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," and while the search must therefore "be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the

> officer or others nearby," *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993) (internal citations and quotations omitted), officers may lawfully seize contraband they incidentally discovery in "plain touch" during a *Terry* frisk.
>
> In *Dickerson*, the Supreme Court established the "plain touch" or "plain feel" concept as an analogue to the plain-view doctrine. *Id.* at 375-76, 113 S. Ct. 2130. . . . *Dickerson* requires the officer conducting a pat-down search [to] have probable cause to believe the item in plain touch is incriminating evidence. *Dickerson*, 508 U.S. at 376, 113 S. Ct. 2130 ("Regardless of whether the officer detects the contraband by sight or by touch . . . the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures."). To give rise to probable cause, the incriminating character of the object must be immediately identifiable. *Id.* at 376, 113 S. Ct. 2130. That is to say, the object must be one "whose contour or mass makes its identity immediately apparent." *Id.*

*United States. v. Bustos-Torres*, 396 F.3d 935, 944-45 (8th Cir. 2005).

In *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), the Supreme Court concluded a frisk search exceeded the scope of *Terry* because the incriminating nature of the contents of the defendant's pockets was not immediately apparent to the officer. Rather, "the officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket – a pocket which the officer already knew contained no weapons.'" *United States v. Hughes*, 15 F.3d 798, 802 (8th Cir. 1994) (quoting *Dickerson*, 508 U.S. at 378, 113 S. Ct. at 2138). The Eighth Circuit distinguished *Dickerson* in *Hughes*, which is factually similar to the present case. In *Hughes*, while an officer conducted a pat-down search for weapons, the officer felt, in the subject's front pants pocket, some small lumps he believed to be crack cocaine. The court held that because the officer immediately suspected the

11

lumps were crack cocaine, seizure of the contraband was authorized under the *Terry* test. *Hughes*, 15 F.3d at 802.

Here, Officer Lutter testified that during his pat-down search of Easley, the officer felt plastic baggies in Easley's pockets. He immediately believed one baggie to contain pills, and the other baggie to contain a powdered substance. The officer already had seen pills on the ground around Johnson, and had been told by other officers at the scene that Johnson was in possession of suspected contraband. Under these facts, the court finds Officer Lutter had probable cause to remove the baggies from Easley's pockets and to seize them. Discovery of the drugs then provided probable cause for Easley's arrest.[1]

For the above reasons, the undersigned recommends denial of Easley's motion to suppress evidence from the search of his person at the Omaha bus terminal.

## II. SEARCH AT SIOUX CITY MOTEL
### A. Background Facts

At about 4:00 p.m. on September 5, 2005, Sioux City police officers received an anonymous citizen complaint about suspected drug activity between Room 37 at the Town and Country Motel in Sioux City, Iowa, and a building across the street from the motel.[2] Officers set up surveillance at the motel for possible drug activity. Officer Sanchez was in a marked police vehicle and in uniform. He parked about a block-and-a-half away from the location. Officer Hansen was in street clothing, driving an unmarked vehicle which he described as "high profile." He testified people were used to seeing his unmarked vehicle in connection with drug investigations.

---

[1] Notably, the court rejects the Government's contention that discovery of drugs in *Johnson's* possession "provided a basis for the arrest of Easley and a lawful search incident to the arrest which yielded the seizure of drugs[.]" Doc. No. 29, p. 3.

[2] The evidence was not clear as to whether the building across the street from the motel was a residence or an office. Officer Hansen testified the citizen complaint mentioned an office, but the officers referred to the building as a house. Because the distinction is not relevant to consideration of Easley's motion to suppress, the court will refer to the location simply as the "building."

Officer Hansen proceeded to the motel parking lot, where he began surveillance at approximately 4:30 p.m. He could see both Room 37 and the building across the street from his surveillance location. The officer observed two or three individuals come from the building across the street, enter Room 37, and go back to the building across the street. The individuals took a circuitous route from the building to the motel room, walking around and between two motel buildings to get to the room. Office Hansen testified it would have been faster to walk straight across the street to get to the room, but then the individuals would have had to walk directly past the officer's vehicle.

Officer Hansen next saw a man drive up to the motel in a gold Honda vehicle, enter Room 37, stay inside for about ten seconds, and come back out. While the individual was walking away from the motel room, he was putting something into his shirt pocket. When the individual got into his vehicle, he reached into his shirt pocket, removed something, took it down below window level, and looked down.

Officer Hansen was parked about twenty feet from the gold Honda, and about twenty-five to thirty feet from Room 37. He saw a female, eventually identified as Karen Wiley, come out of Room 37 and begin talking animatedly with the individual in the Honda, while pointing to Officer Hansen's vehicle. The officer testified the Honda's driver saw him, and immediately began to back up his vehicle. The officer drove his car closer to the Honda, got out of his car just a few feet from the Honda, displayed his badge to the driver, and told the driver to stop his car. The driver did not comply, and kept driving. At that point, the officer drew his weapon and again directed the driver to stop. The driver complied, and Officer Hansen approached the Honda. The driver identified himself as Keo Sengchan. The officer asked if he had purchased drugs inside the motel room. Initially, Sengchan said he had not purchased any drugs in the motel room, and he did not have any money on his person.

Officer Hansen asked Sengchan to step out of his car. By this time, Officer Sanchez had arrived at the scene. He asked Sengchan if he had any weapons, and Sengchan stated

13

he had a knife in his pocket. He began to reach for the knife, but officers stopped him, and Officer Hansen removed the knife from Sengchan's pocket. Sengchan was then placed under arrest for possession of the knife, based on the length of the knife blade. The officers searched Sengchan's vehicle incident to the arrest. They find a small quantity of crack cocaine and a crack pipe. After the officers had discovered the drugs and paraphernalia, Sengchan told Officer Hansen he had purchased the cocaine from Wiley inside Room 37. He stated he had paid $5.00 for a $10.00 rock, and he still owed $5.00. More specifically, Sengchan said he had put $5.00 down on a table, Wiley had put the drugs on the table, and Sengchan had picked the drugs up off of the table. Officer Hansen testified that at this point, he believed he could arrest Wiley for keeping a disorderly house.

Officer Sanchez approached the door to Room 37 and knocked. Wiley opened the door, and Officer Sanchez asked her to step outside the motel room. Sengchan identified Wiley as the person from whom he had purchased the drugs. Officer Sanchez asked for, and received, Wiley's written consent to enter the motel room. In addition to Wiley, there were three other occupants of the motel room, one of whom was Easley. All of the individuals were asked to step outside of the motel room. After everyone was outside, Officer Sanchez began to search the motel room, sometimes with the assistance of other officers who had arrived at the scene.

While the search of the motel room was taking place, Officer Hansen talked with the individuals who had been in the room. He observed Easley becoming agitated, and Easley indicated he wanted to give his statement and then leave the scene. The more agitated Easley became, the more concerned Officer Hansen became. Officer Hansen then told Wiley she was going to be arrested for keeping a disorderly house, and he told the other three individuals, including Easley, they would be arrested for frequenting a disorderly house. Officer Hansen advised Wiley that she needed to turn over any drugs

she might have on her person. Wiley produced some cocaine from the crotch area of her pants.

Easley was searched incident to his arrest. Nothing was found on Easley's person at the scene, but money and drugs were found on Easley's person at the jail. The arrest of Easley, Wiley, and the other individuals from the motel room took place at approximately 4:45 to 4:50 p.m., just a few minutes after the surveillance had begun.

### B. *The Parties' Arguments*

Easley points out that he was arrested for frequenting a disorderly house. He argues that at the time of his arrest, officers had no facts or information that the applicable section of the Sioux City Municipal Code was being violated by open storage, use, or consumption of a controlled substance, nor did they have facts that Easley had committed or was about to commit a crime. He therefore claims there was no probable cause to detain, arrest, or search him. *See* Doc. No. 16, pp. 4-5. Easley further argues he did not consent to a search of his person, and because officers lacked probable cause to arrest him, the search of his person violated his rights under the Fourth Amendment. *Id.*, p. 5.

The Government argues that once officers learned a drug transaction had taken place inside the motel room, they had probable cause to arrest all occupants of the motel room on charges of frequenting a disorderly house, and they then lawfully searched Easley incident to his arrest. *See* Doc. No. 24, p. 3.

### C. *Discussion*

Easley bases his argument on the provisions of the code section prohibiting a person from frequenting or being found in a disorderly house.

> The term "disorderly house" means any structure or any room therein, or any part of the premises adjacent thereto, in or upon which occurs any disorderly conduct defined in Section 8.8.010-1 through 7 or any of the following prohibited activities:

15

> 1. The open storage, use or consumption of a controlled substance as defined in Chapter 124 of the Iowa Code, under which possession of such a substance would be an offense. . . .

Doc. 16, p. 4, quoting Sioux City Municipal Code § 8.08.020. Easley argues officers had no information that there was, in the motel room, any "open storage, use or consumption of a controlled substance." *Id.*

Probable cause for an arrest exists if the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 2632, 61 L. Ed. 2d 343 (1979). "The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Id.*, 443 U.S. at 36, 99 S. Ct. at 2631.

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Id.* (citations omitted). "Iowa law allows peace officers to make warrantless arrests for 'public offense,' which include municipal ordinances with a penalty of a fine or imprisonment." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1106 (8th Cir. 2004) (citations omitted). Furthermore, an arrest is lawful if there is probable cause to believe a suspect has "violated *any* applicable statute, even one not contemplated by the officers at the moment of arrest." *Id.* (emphasis added). The relevant question is whether, given all of the facts and circumstances within the officers' knowledge, the officer was reasonable in believing the person was committing, or about to commit, an offense. *DeFillippo*, 443 U.S. at 37, 99 S. Ct. at 2632.

During the short time the motel room had been under surveillance, Officer Hansen had seen two or three people leave the building across the street, go into the motel room via a circuitous route, and return to the building. He had seen another individual, Sengchan, drive up, enter the room for a few seconds, and come out putting something in his pocket. He then saw Wiley come out, talk animatedly to Sengchan while pointing at the officer's vehicle, and Sengchan attempt to drive away. After stopping and confronting Sengchan, he learned Sengchan had purchased drugs from Wiley inside the motel room. The court finds it was abundantly reasonable for Officer Hansen to conclude drugs were being openly stored, used, or consumed within the motel room, for purposes of providing probable cause to arrest the individuals in the motel room on, at a minimum, charges of frequenting a disorderly house. Whether that particular charge ultimately was upheld is irrelevant to the lawfulness of the arrest. *DeFillippo*, 443 U.S. at 36, 99 S. Ct. at 2631; *see Lawyer*, 361 F.3d at 1106.

Once the arrest had been made, officers lawfully could search Easley incident to his arrest. *See United States v. Pratt*, 355 F.3d 1119, 1124 (8th Cir. 2004) ("The search of an arrestee's person has long been upheld as reasonable under the Fourth Amendment. . . .")

The court therefore recommends denial of Easley's motion to suppress evidence seized from him following his arrest at the motel.

### III. CONCLUSION

For the reasons set forth above, **IT IS RESPECTFULLY RECOMMENDED** that the defendants' motions to suppress be **denied**.

Any party who objects to this report and recommendation must serve and file specific, written objections by **January 17, 2006**. Any response to the objections must be served and filed by **January 23, 2006.**

17

**Any party planning to lodge objections to this report and recommendation must order a transcript of the hearing promptly.**

**IT IS SO ORDERED.**

**DATED** this 9th day of January, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT