# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ALTON EASLEY,<br><br>    Defendant. | No. CR05-4107-MWB<br><br>**ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO SUPPRESS** |

_____

## TABLE OF CONTENTS

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   *B. Objection To Report And Recommendation* . . . . . . . . . . . . . . . . . . . . . 10

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## *I. INTRODUCTION AND BACKGROUND*

### *A. Procedural Background*

On October 12, 2005, an indictment was returned against defendant Alton Easley

charging him with conspiracy to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846, and possessing 5 grams or more of crack cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Defendant Easley filed a motion to suppress. In his motion, defendant Easley seeks to evidence seized discovered during two unrelated searches-a *Terry* stop pat-down, *see Terry v. Ohio*, 392 U.S. 1 (1968), that occurred after defendant Easley's companion fled from the police, and evidence recovered following defendant Easley's arrest on another occasion. Defendant Easley's motion to suppress was referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). Judge Zoss conducted an evidentiary hearing and then filed a Report and Recommendation in which he recommended that defendant Easley's motion to suppress be denied. With respect to the *Terry* stop search, Judge Zoss concluded that it was reasonable for the police officer to believe his safety could be in danger from Easley and that Easley's detention was reasonably related in scope to the circumstances which justified his being stopped initially. Judge Zoss also concluded that the police officer was justified in conducting a protective pat-down search of Easley. Next, Judge Zoss found that the police officer was justified in seizing the plastic baggies of drugs from Easley's pockets. Judge Zoss further concluded that the discovery of the drugs then provided probable cause for Easley's arrest. With respect to the later search which followed Easley's arrest on another occasion, Judge Zoss concluded that the police had probable cause to arrest defendant Easley on the charge of frequenting a disorderly house and that, as a result, the police lawfully searched Easley incident to his arrest.

Defendant Easley has filed an objection to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Easley's motion to suppress.

## B. *Factual Background*

In his Report and Recommendation, Judge Zoss made the following findings of fact with respect to the *Terry* stop search:

> On July 21, 2005, Officers Scott and Lutter were working with the Nebraska State Patrol's Commercial Interdiction Unit, which is tasked with disrupting the flow of narcotics coming into and traveling through Nebraska by commercial carrier. At about 6:30 a.m., the officers were conducting their daily activity of watching the morning buses coming into the Greyhound bus terminal in Omaha, Nebraska. The officers watched people exit the buses, examined luggage for packages consistent with drug couriers, and watched for suspicious activities.
>
> The officers observed two black males, later identified as Alton Easley and Gregory Johnson, exit one of the buses. The men appeared to be traveling together. Easley and Johnson walked over and stood against the wall of the terminal, twenty-five to thirty feet from the bus, where they watched as the officers checked the baggage and the bus. The officers testified it was not unusual for passengers to notice the officers' activities, but usually, people would pay little attention to what the officers are doing. However, Easley and Johnson seemed unusually interested in what the officers were doing.
>
> The officers approached Easley and Johnson. The officers identified themselves and showed their identification. Officer Scott advised Easley and Johnson that they were not under arrest or in any kind of trouble, and asked if the officers could speak with them. Easley and Johnson agreed to speak with the officers. Officer Scott spoke with Johnson, while Officer Lutter spoke with Easley.
>
> Johnson identified himself to Officer Scott as Michael Aaron. Shortly thereafter, Officer Scott saw Easley point to Johnson and identify him as "Greg." Officer Scott asked Johnson if he had his bus ticket with him, or any sort of

identification. Johnson did not produce a ticket or an I.D., and he began making furtive movements toward his waistline, as if he were trying to adjust something or gain access to something in that area. Officer Scott testified Johnson kept turning his waistline away from the officer, as if he were trying to hide something. Johnson was dressed in baggy street clothing. Johnson stated his bus ticket was still on the bus, and he and Officer Scott went back onto the bus to try to locate the ticket. Johnson identified a black duffel bag as his, and stated his ticket was in the bag. However, after looking through the bag, he still was unable to produce his ticket. He and Officer Scott got back off of the bus.

While these events were taking place, Officer Lutter was talking with Easley. Easley said he had traveled to Kansas City to get his cousin, whom he identified as Johnson. Easley voluntarily provided his bus ticket to Officer Lutter, and the officer observed that Easley's hand was shaking. The officer noted the ticket was for an individual named Forest Smith, who had purchased a one-way ticket from Kansas City, Missouri, to Sioux City, Iowa, for cash, about two hours prior to travel. Officer Lutter testified that in his experience, drug couriers often purchase a one-way ticket for cash a short time prior to travel, and this increased his suspicion. Officer Lutter asked Easley for his identification. Easley stated his I.D. was on the bus, and he agreed to retrieve it. By this time, Officer Scott and Johnson had already gotten back off of the bus.

Easley and Officer Lutter got onto the bus, but Easley could not locate his luggage. Easley got off the bus and asked Johnson what had happened to "the bag," but Johnson did not respond. Easley got back onto the bus, and walked to a black duffel bag located a few seats directly behind the driver's seat. Officer Lutter testified Easley appeared to be extremely nervous and uncomfortable as he attempted to locate his I.D. Easley was speaking in partial sentences, and he would not make eye contact with the officer. Once he located the duffel bag, he unzipped the bag, handled it briefly, and then, according to Officer Lutter, Easley just stopped and stared at

4

the officer. The officer asked Easley if that was his bag, and Easley did not respond or communicate at all; he just stood and stared. Easley never gave any indication as to whether or not he had found his I.D.

Outside, the bus, Officer Scott continued talking with Johnson. He told Johnson the officers were watching for people who might be transporting drugs, bombs, guns, money, etc. When the officer got to the "gun" portion of his explanation, Johnson raised his shirt from his waistline and stated he did not have any guns. When Johnson raised his shirt, Officer Scott saw clear plastic baggies at Johnson's waistline. The officer pointed to the baggies, and Johnson turned and ran from the officer, down the length of the bus and out onto the street. As he pursued Johnson, Officer Scott yelled "Rich," which is Officer Lutter's first name. Johnson tripped and fell to the ground. While Officer Scott and another officer who was at the scene were attempting to take Johnson into custody, Johnson kept putting his hands into his waistband. Johnson threw a bunch of pills out into the street. The officers believed the pills to be Ecstacy.

On the bus, Officer Lutter heard Officer Scott yell his name. Officer Lutter looked out the window of the bus and observed Johnson running from the scene, tripping and falling, and being apprehended by officers. Officer Lutter immediately put his hands on Easley, advised him to remain still, and stated he would be put in handcuffs for the officer's personal safety. Officer Lutter testified he was concerned because of Easley's behavior and the other circumstances at the terminal. He stated Easley appeared nervous, would not make eye contact during conversation, and his hand was shaking when he presented the bus ticket to the officer. Easley did not answer questions in complete sentences, and he mumbled when speaking. Easley's nervousness appeared to increase as the encounter continued, until the point where he "shut down" and quit even trying to locate his identification. The officer's concern and suspicion were increased when Easley's traveling companion ran from officers. However, the

5

> officer testified Easley never offered any resistance or made any threatening motions toward the officer.
>
> Officer Lutter handcuffed Easley, and the two of them got off the bus. Officer Lutter testified he planned to conduct a pat-down search of Easley, but he did not want to conduct the search in the confined area of the bus aisle. The officer began a pat-down search of Easley to check for weapons or dangerous items. While he was conducting the search, Officer Lutter observed pills on the ground in the area where Johnson was being arrested, and he heard other officers state there were controlled substances present.
>
> During the pat-down search of Easley, Officer Lutter felt plastic bags in Easley's pockets. The bag in Easley's left pocket felt as though it contained pills, and another bag felt like it contained a powdery substance. Officer Lutter removed the plastic bags from Easley's pockets and identified the bags' contents as probable Ecstasy pills and powder cocaine. Tests later confirmed one bag contained 65 1/2 tablets of Ecstasy, and the other bag contained 64 grams of powder cocaine. Officer Lutter testified that at the time the baggies were removed from Easley's pockets, Easley was not under arrest.

Report and Recommendation at pp. 2-5.

Judge Zoss also made the following findings of fact with respect to the second, later search:

> At about 4:00 p.m. on September 5, 2005, Sioux City police officers received an anonymous citizen complaint about suspected drug activity between Room 37 at the Town and Country Motel in Sioux City, Iowa, and a building across the street from the motel. Officers set up surveillance at the motel for possible drug activity. Officer Sanchez was in a marked police vehicle and in uniform. He parked about a block-and-a-half away from the location. Officer Hansen was in street clothing, driving an unmarked vehicle which he described as "high profile." He testified people were used to seeing his

unmarked vehicle in connection with drug investigations.

Officer Hansen proceeded to the motel parking lot, where he began surveillance at approximately 4:30 p.m. He could see both Room 37 and the building across the street from his surveillance location. The officer observed two or three individuals come from the building across the street, enter Room 37, and go back to the building across the street. The individuals took a circuitous route from the building to the motel room, walking around and between two motel buildings to get to the room. Office Hansen testified it would have been faster to walk straight across the street to get to the room, but then the individuals would have had to walk directly past the officer's vehicle.

Officer Hansen next saw a man drive up to the motel in a gold Honda vehicle, enter Room 37, stay inside for about ten seconds, and come back out. While the individual was walking away from the motel room, he was putting something into his shirt pocket. When the individual got into his vehicle, he reached into his shirt pocket, removed something, took it down below window level, and looked down.

Officer Hansen was parked about twenty feet from the gold Honda, and about twenty-five to thirty feet from Room 37. He saw a female, eventually identified as Karen Wiley, come out of Room 37 and begin talking animatedly with the individual in the Honda, while pointing to Officer Hansen's vehicle. The officer testified the Honda's driver saw him, and immediately began to back up his vehicle. The officer drove his car closer to the Honda, got out of his car just a few feet from the Honda, displayed his badge to the driver, and told the driver to stop his car. The driver did not comply, and kept driving. At that point, the officer drew his weapon and again directed the driver to stop. The driver complied, and Officer Hansen approached the Honda. The driver identified himself as Keo Sengchan. The officer asked if he had purchased drugs inside the motel room. Initially, Sengchan said he had not purchased any drugs in the motel room, and he did not have any money on his person.

7

Officer Hansen asked Sengchan to step out of his car. By this time, Officer Sanchez had arrived at the scene. He asked Sengchan if he had any weapons, and Sengchan stated he had a knife in his pocket. He began to reach for the knife, but officers stopped him, and Officer Hansen removed the knife from Sengchan's pocket. Sengchan was then placed under arrest for possession of the knife, based on the length of the knife blade. The officers searched Sengchan's vehicle incident to the arrest. They find a small quantity of crack cocaine and a crack pipe. After the officers had discovered the drugs and paraphernalia, Sengchan told Officer Hansen he had purchased the cocaine from Wiley inside Room 37. He stated he had paid $5.00 for a $10.00 rock, and he still owed $5.00. More specifically, Sengchan said he had put $5.00 down on a table, Wiley had put the drugs on the table, and Sengchan had picked the drugs up off of the table. Officer Hansen testified that at this point, he believed he could arrest Wiley for keeping a disorderly house.

Officer Sanchez approached the door to Room 37 and knocked. Wiley opened the door, and Officer Sanchez asked her to step outside the motel room. Sengchan identified Wiley as the person from whom he had purchased the drugs. Officer Sanchez asked for, and received, Wiley's written consent to enter the motel room. In addition to Wiley, there were three other occupants of the motel room, one of whom was Easley. All of the individuals were asked to step outside of the motel room. After everyone was outside, Officer Sanchez began to search the motel room, sometimes with the assistance of other officers who had arrived at the scene.

While the search of the motel room was taking place, Officer Hansen talked with the individuals who had been in the room. He observed Easley becoming agitated, and Easley indicated he wanted to give his statement and then leave the scene. The more agitated Easley became, the more concerned Officer Hansen became. Officer Hansen then told Wiley she was going to be arrested for keeping a disorderly house, and he told the other three individuals, including Easley, they

> would be arrested for frequenting a disorderly house. Officer Hansen advised Wiley that she needed to turn over any drugs she might have on her person. Wiley produced some cocaine from the crotch area of her pants.
>
> Easley was searched incident to his arrest. Nothing was found on Easley's person at the scene, but money and drugs were found on Easley's person at the jail. The arrest of Easley, Wiley, and the other individuals from the motel room took place at approximately 4:45 to 4:50 p.m., just a few minutes after the surveillance had begun.

Report and Recommendation at pp. 12-15. Upon review of the record, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL ANALYSIS

### A. Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept,

9

> reject, or modify the recommended decision, receive further
> evidence, or recommit the matter to the magistrate judge with
> instructions.

FED. R. CIV. P. 72(b).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*). As noted above, defendant Easley has filed an objection to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Easley's motion to suppress.

### *B. Objection To Report And Recommendation*

Defendant Easley objects to Judge Zoss's legal conclusion, with respect to the *Terry* stop search, that there was more than mere propinquity to support the detention and pat-down of Easley. Easley argues that the facts relied upon by Judge Zoss fail to give rise to probable cause to search him.

The Fourth Amendment of the United States Constitution protects citizens against unreasonable searches and seizures and provides that "no [arrest or search] Warrants shall issue, but upon probable cause." U.S. CONST. AMEND. IV. However, there are certain narrowly drawn exceptions to the probable cause requirement of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). In *Terry*, the United States Supreme Court established the authority of law enforcement officers to stop and frisk a suspect for weapons

when they believe that the individual may be armed and dangerous, regardless of whether the officers have probable cause to arrest. Under *Terry*, "[t]he officer need not be absolutely certain that the individual is armed" before conducting a pat-down for weapons. *Id.* at 27. Rather, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

In *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993), the Court offered the following explanation of its *Terry* holding:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. . . ." Rather, a protective search – permitted without a warrant and on the basis of reasonable suspicion less than probable cause – must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.

*Dickerson*, 508 U.S. at 373 (citations omitted) (quoting *Terry,* 392 U.S. at 24 and *Adams v. Williams*, 407 U.S. 143, 145-46 (1972)).

Applying the principles set forth in *Terry* and its progeny, the court concludes that a reasonably prudent person in Officer Lutter's position would be warranted in the belief that his safety or that of others was in danger such that a pat-down of defendant Easley was warranted. Here, there was more than mere propinquity to support Officer Lutter's decision to detail and pat-down defendant Easley. At the point where Officer Lutter

handcuffed Easley, Officer Lutter was aware of the following: He observed Easley and Johnson watching their drug interdiction activities at the bus station. Officer Lutter testified that such actions were consistent with the counter-surveillance actions conducted by narcotics traffickers. When Officer Lutter approached Easley he noticed Easley's initial nervousness, as Easley's hands shook when he handed his bus ticket to the officer and Easley would not make eye contact. Easley's nervousness increased throughout his encounter with Officer Lutter until he reached a point where he completely quit responding to questions and simply stood and stared at Officer Lutter. Moreover, the bus ticket that Easley gave to Officer Lutter was in the name of Forrest Smith, but Easley was unable to find his identification to establish his identity. The bus ticket was a one-way ticket that was purchased with cash a short time before departure. Officer Lutter testified that, based on his training and experience, tickets purchased with cash shortly before departure were a "red flag" for drug trafficking activity. Then, while he was in the confined quarters of the bus with Easley, Officer Lutter's partner yelled out his name, and Lutter saw Johnson running from, and then being apprehended by, law enforcement officers. Johnson's unprovoked flight constituted reasonable suspicion of criminal activity on his part. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"). Officer Lutter had been told by Easley that Easley was traveling from Kansas City with his cousin, Johnson. Under such circumstances, the court concurs with Judge Zoss's assessment that it was reasonable for Officer Lutter to believe his safety could be in danger from Easley. Thus, the court concludes that the initial seizure and pat-down of Easley was lawful in this case. Therefore, defendant Easley's objection to Judge Zoss's Report and Recommendation is denied. It appears to the court, upon review of Judge Zoss's other findings and conclusions, that there is no ground to reject or modify them.

## *III. CONCLUSION*

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendant Easley's motion to suppress.

**IT IS SO ORDERED.**

**DATED** this 25th day of January, 2006.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA